Sophia Goren Gold (SBN 307971)
KALIEL GOLD PLLC
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
sgold@kalielgold.com

Jeffrey D. Kaliel (SBN 238293)
Amanda J. Rosenberg (SBN 278507)
KALIEL GOLD PLLC
1100 15th Street NW 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
arosenberg@kalielgold.com

*Counsel for Plaintiff and Proposed Classes*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASMINE LEWIS, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>GREYSTAR CALIFORNIA, INC., dba GREYSTAR,<br><br>    Defendants, | Case No.: **'24CV1619 DMS MSB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Jasmine Lewis ("Plaintiff"), on behalf of the putative Class, by her undersigned counsel, and for her Class Action Complaint against Defendant Greystar California, Inc. dba Greystar, alleges as follows:

## **PRELIMINARY STATEMENT**

1.  This is a proposed class action seeking monetary damages, restitution, and injunctive and declaratory relief from property management company Defendant Greystar California, Inc. dba Greystar ("Defendant" or "Greystar") arising from its deceptive and unfairly disclosed junk "Utility Admin Fee" assessed on tenants.

2. Each month, Greystar assesses a small "Utility Admin Fee" of $1.00-$5.00 in hopes that it will go unnoticed and uncontested by tenants who have already invested substantial time and resources into the moving process.

3. Junk fees inflate prices and undermine fair competition, which should involve corporations competing openly over the true price of goods. Instead, across the country, people are now used to seeing their costs go up due to inflated and hidden fees that are often not disclosed until the very end of a transaction.

4. Frequently, hidden fees are disclosed so late (if at all) that consumers cannot realistically go elsewhere, giving the consumer no choice but to bear these deceptive and unfair fees if they want to purchase concert tickets, banking services, utilities, or any number of other goods or services.

5. The late disclosure of junk fees is particularly problematic in apartment rental contracts, such as the one between Plaintiff and Defendant, because tenants may not learn of the fees (or see a copy of their lease) until shortly before move-in, after they have given notice to a prior landlord or invested significant moving expenses.

6. In the case of Greystar, rental junk fees operate like a hidden tax on tenants who have no choice but to pay contrived fees if they want to stay in a home or rent a new one. Greystar's junk fees do not provide tenants with any special benefits or services beyond ordinary costs of doing business that Greystar is required to bear as a landlord. In other words, these junk fees serve no legitimate purpose but to increase Greystar's profits and inflate its bottom line.

7. Defendant does everything it can to hide the Utility Admin Fee. Many times, this works: consumers do not even notice that the total amount they are being charged for rent has increased.

8. Moreover, even consumers who notice the extra fee often still go through with the lease. Having fulfilled the difficult steps of applying for a rental and given up prior living arrangements, consumers are left with no choice but to pay the fee.

9. Either way, the result is the same. Defendant's deceptive late added Utility Admin Fee did its job and consumers rent from Defendant. As a result, Defendant profits.

10. This practice has been going on for years. It has made Defendant and its unscrupulous owners major players in the payment processing industry, earning hundreds of millions of dollars per year from unsuspecting consumers.

11. It is false and deceptive for Defendant to surreptitiously add a "Utility Admin Fee" to tenants' rent payments.

12. Worse, the Utility Admin Fee itself is a sham, a classic "junk fee." The Utility Admin Fee is merely a second payment—in the form of a junk fee—for the services for which the tenants are already paying.

13. By hiding the mis-named and deceptive fee until tenants have no choice but to pay it, Defendant has raked in millions of dollars in Utility Admin Fees at the expense of its tenants.

14. The belated disclosure of these fees—when they are disclosed at all—also undermines fair competition. Prospective tenants cannot meaningfully compare prices for apartment rentals when significant portions of the monthly rent are disguised as add-on fees. This may lead tenants to pay more than they otherwise would have for monthly rent, even when they can ill-afford the difference in price.

15. As a result of Defendant's unfair and deceptive conduct, Plaintiff and the proposed class have suffered damages. They paid these fees only as a result of Defendant's deceptive bait and switch scheme.

16. Defendant should not be allowed to profit from this deception. Plaintiff seek damages and, among other remedies, injunctive relief that fairly allows consumers to decide whether they will pay the so-called Utility Admin Fee.

## **PARTIES**

17. Plaintiff Jasmine Lewis is a resident and citizen of San Diego, California.

18. Defendant Greystar California, Inc. dba Greystar is a Delaware corporation with its headquarters in Charleston, South Carolina.

## JURISDICTION AND VENUE

19. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because:

   a. the proposed Class is comprised of at least 100 members, § 1332(d)(5)(B);

   b. at least one member of the proposed class is a citizen of a State other than California, § 1332(d)(2)(A); and

   c. the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, § 1332(d)(2), (6).

20. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**A.   Overview of Greystar**

21. According to its website, Greystar serves as the property manager for 996,900 multifamily units and student beds globally. See https://www.greystar.com/. It has assets under management of more than $78.6 billion. *Id*.

22. Greystar purports to provide "we provide end-to-end property management services for residential housing, apartment homes, furnished corporate housing, and mixed-use properties incorporating retail space." See https://www.greystar.com/business-services/property-management (last visited August 31, 2024).

23. On information and belief, all of Greystar's California properties are subject to the same Form Lease terms and policies.

24. The Form Lease is a contract of adhesion consisting of boilerplate terms and provided to tenants on a take-it-or-leave-it basis.

25. As a result of the standardized language, all Greystar tenants are subject essentially identical lease terms regardless of where they reside in California.

26. Similarly, Greystar seeks to collect Utility Admin Fees in the same unlawful manner with respect to its California tenants.

27. Greystar's Utility Admin Fee appears to cost tenants between $1.00-$5.00 per month. Nowhere does Greystar identify how this will be determined.

28. Greystar pursues the Utility Admin Fee through collections actions up to and including eviction.

29. Greystar's pricing structure and disclosure practices are deceptive because they do not include junk fees as part of advertised rents and only disclose the fees after tenants have made initial payments to Greystar.

30. Greystar misrepresents the total costs of its rental units by omitting the Utility Admin Fees from advertised rent prices and by ultimately disclosing the fees in the lease agreement separate and apart from the base rent.

31. In fact, on information and belief, the Utility Admin Fee is not disclosed at all until after the tenants have already spent hundreds or thousands of dollars on non-refundable fees to apply for and secure the unit, in addition to paying other costs such as moving related expenses.

32. On information and belief, tenants are not informed of the Utility Admin Fee until they are presented with the Form Lease, which is well after they have already expended substantial effort into searching for a rental, initiating the rental process, paying non-refundable application fees, administrative fees, security deposits, pet deposits and first month's rent. Thus, at the point the Utility Admin Fee is disclosed, it is near impossible and incredibly cost prohibitive to find alternative housing to avoid a a small $1-$5 fee.

33. Through the imposition of junk fees, Greystar misrepresents the characteristics and identity of the product and services received for the payment of monthly rents.

34. By advertising rental housing in exchange for a monthly rent amount, Greystar represents that tenants will receive a suitable dwelling place in exchange for the payment of monthly rent. However, tenants later learn that they will not receive a suitable dwelling place without additional purchases in the form of additional mandatory fees.

35. Greystar continues to misrepresent the characteristics and identity of the product and services received in exchange for the payment of monthly rents.

36. Worse yet, tenants do not receive any additional utility services by paying the Utility Admin Fee. Tenants' ledgers show that they are already paying a fee for the utilities of gas, trash, and sewer, and electricity is paid for by the tenant directly to the relevant electricity provider.

37. The Utility Admin Fee is nothing but a pure profit generator without any actual purpose.

38. Greystar's deceptive advertising, pricing structure, and inflation of its fees all harm Colorado consumers. Consumers are unable to truly compare the cost of different apartments and are financially harmed when they must pay fees they did not expect (and may be unable to afford). And consumers are also harmed by Greystar's mandatory, inflated fees which tenants have no opportunity to negotiate and which may balloon in Greystar's sole discretion.

39. Greystar charged Plaintiff $4.75/month, or $57 a year, on top of advertised leasing rates, for the simple privilege of providing to the customer the ability to pay her bill. On information and belief, Greystar charges approximately $57 per year on all of its 966,000 units across the country, netting the company approximately $55 million from this nonsense fee a year.

///

6
CLASS ACTION COMPLAINT

**B.     The Utility Admin Fee is a Junk Fee That Violates Federal Guidance**

40.     Greystar's Utility Admin Fee is precisely the type of "Junk Fee" that has come under government scrutiny in recent years:

> Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.

The White House, <u>The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition</u>, March 5, 2024, available at https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/#_ftnref3.

41.     As the Federal Trade Commission said recently in its effort to combat Junk Fees,

> [M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.

42.     Federal Trade Commission, <u>FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees</u>, , October 11, 2023, available at https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees.

43.     In its own effort to combat junk fees, the State of New York recently passed N.Y. Arts & Cult. Aff. Law § 25.07 concerning fees associated with tickets to sports and concerts.  Under that law, "[t]he price of the ticket shall not increase during the purchase process, excluding reasonable fees for the delivery of non-electronic tickets based on the delivery method selected by the purchaser, which shall be disclosed prior to accepting payment therefor." N.Y. Arts & Cult. Aff. Law § 25.07(4). Accordingly, if the consumer selects to purchase a ticket electronically, at the start of

the transaction, the total ticket price shall not increase during the period it takes the consumer to purchase the ticket (e.g., finish the online transaction). The "All-In Price" must be disclosed to the consumer before the consumer selects the ticket for purchase. Similarly, here, the "All-In Price" should have been displayed to the consumer throughout the enrollment process.

44. Just this month, California expanded its Consumer Legal Remedies Act ("CLRA") was amended to make illegal "drip pricing," which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service. California Civil Code Section 1770(a)(29). Under the new California law, it is now illegal to advertise a low price for a product, only for that product to be subject to additional or mandatory fees later.

45. In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising, the FTC makes clear that when advertising and selling are combined on a website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy – for example, before the consumer "add[s] to shopping cart." See Fed. Trade Comm'n, .com Disclosures: How to Make Effective Disclosures in Digital Advertising at ii, 14 (Mar. 2013), available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

46. Defendant violates federal guidance by adding Utility Admin Fee so late in the rental process well after the consumer "add[s] to shopping cart", and by failing to disclose the nature of the Utility Admin Fee and whether consumers are getting any benefit at all from the fee charged. Worse yet, there is no actual additional administration of utilities performed where the tenants are already paying for utilities.

47. The Utility Admin Fee provides no additional value to consumers not already paid for by the tenant. There is no additional "administration" provided by

Defendant. The Utility Admin Fee is merely a second payment—in the form of a junk fee—for the services for which the tenants are already paying Defendant.

48. Defendant imposes undisclosed, deceptive, and unfair junk fees on families who are coerced into believing that they have no choice but to pay them. By this conduct, Defendant has engineered a "pay junk fees to play" scheme. Having invested substantial time, money, and resources into preparing for a move, tenants are left with no choice but to pay the junk fee unilaterally set by Defendant with zero relationship to the service actually being provided.

### C. Plaintiff's Experience

49. On or about February 14, 2023, Plaintiff signed a lease agreement with Defendant to reside in a property in San Diego, California. The terms of her lease were presented on a take it or leave it basis and were not negotiable.

50. From March 1, 2023 through March 1, 2024, Plaintiff was charged a $4.75 "Utility Admin Fee" by Defendant each month.

51. Plaintiff was assessed and paid the Utility Admin Fee every month during tenancy. She did so to protect her interest in the leasehold.

52. Had Defendant disclosed the Utility Admin Fee prior to Plaintiff's rental of the apartment, Plaintiff may have made a different choice with respect to whether to rent an apartment through Greystar.

## CLASS ALLEGATIONS

53. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements.

54. All persons in California who, during the applicable statute of limitations, were charged a Utility Admin Fee by Defendant.

55. The Nationwide Class and alternative state subclass defined above are collectively referred to herein as the "Class." Plaintiff reserves the right to modify or

amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

56. Excluded from the Class are Defendant, its consumers, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all personal accountholders who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

57. The members of the Class are so numerous that joinder is impractical. The Class consist of at least thousands of members, the identity of whom is within the knowledge of, and can be ascertained only by resort to, Defendant's records.

58. The claims of the representative Plaintiff are typical of the claims of the Class he seeks to represent in that the representative Plaintiff, like all members of the Class, were charged improper and deceptive fees as alleged herein. The representative Plaintiff, like all members of the Class, were damaged by Defendant's misconduct in that they were charged hidden Utility Admin Fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Class and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class. And Defendant has no unique defenses that would apply to Plaintiff and not the Class.

59. There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual members of the Class. The questions of law and fact common to the Class include, but are not limited to, the following:

    a.    Whether Defendant's assessment of Utility Admin Fees was unfair, deceptive, or misleading;

    b.    Whether Defendant's assessment of Utility Admin Fees breached the contract;

    c.    The proper method or methods by which to measure damages and/or

restitution and/or disgorgement; and

d. Whether Plaintiff and the Class are entitled to declaratory and injunctive relief and the nature of that relief.

60. Plaintiff's claims are typical of the claims of other members of the Class, in that they arise out of the same wrongful Utility Admin Fee policies and practices. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Class.

61. Plaintiff is committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

62. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual member of the Class's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no member of the Class could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defendant's misconduct will proceed without remedy.

63. Even if members of the Class themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

64. Plaintiff knows of no difficulty to be encountered in the maintenance of

this action that would preclude its treatment as a class action.

65. Defendant has acted or refused to act on grounds generally applicable to each of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

66. All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

67. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

68. Plaintiff and Defendant have contracted for the lease of a rental apartment.

69. Defendant mischaracterized in the contract its true fee practices and breached the terms of the contract.

70. Under California law, the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith is also mandated by the Uniform Commercial Code ("UCC"), which covers rental transactions.

71. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

72. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be

overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

73. Under the Form Lease, Defendant has the ability to determine which charges get billed in any particular month and the manner by which those charges will be pursued.

74. Defendant has abused its discretion by grossly overcharging for its actual costs for utility administration. Further, only Defendant knows its actual costs, and by turning the utility admin fees into profit centers Defendant makes it more difficult for tenants to make rent and enjoy their tenants.

75. Defendant has breached the covenant of good faith and fair dealing through its Utility Admin Fee policies and practices as alleged herein.

76. Defendant harms consumers by abusing its contractual discretion in a number of ways that no reasonable customer could anticipate.

77. Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them by the contract.

78. Plaintiff and members of the Class have sustained damages as a result of Defendant's breach of the contract and breach of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

79. The preceding allegations are incorporated by reference.

80. To the detriment of Plaintiff and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

81. Plaintiff and the Class conferred a benefit on Defendant when they paid Defendant the Utility Admin Fee, which they did not agree to and could not reasonably avoid.

82. Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

83. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

84. Plaintiff and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

**THIRD CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200, et seq.)**
**(On Behalf of Plaintiff and the Class)**

85. Plaintiff hereby incorporates by reference the preceding paragraphs.

86. Defendant's conduct described herein violates the Unfair Competition Law ("UCL"), codified at California Business and Professions Code section 17200, *et seq*.

87. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

88. The UCL imposes strict liability. Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

89. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

90. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

91. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

92. Defendant committed unfair and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by affirmatively and knowingly misrepresenting that the presence and nature of its Utility Admin Fees.

93. Defendant's acts and practices offend an established public policy of truthful advertising in the marketplace, and constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

94. The harm to Plaintiff and the Class outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misleading and deceptive conduct described herein.

95. Defendant's conduct also constitutes an "unlawful" act under the UCL because it also constitutes a violation of sections 1770(a)(5) and (a)(9) of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code section 1750, *et seq.*

96. Defendant's business practices have misled Plaintiff and the proposed Class and, unless enjoined, will continue to mislead them in the future.

97. Plaintiff relied on Defendant's misrepresentations in selecting her rental apartment and choosing to enter into a contract with Defendant.

98. By falsely marketing its Utility Admin Fee practices, Defendant deceived Plaintiff and Class members into renting apartments they otherwise would not have rented.

99. As a direct and proximate result of Defendant's unfair, fraudulent, and unlawful practices, Plaintiff and Class members suffered and will continue to suffer actual damages. Defendant's fraudulent conduct is ongoing and presents a continuing threat to Plaintiff and Class members that they will be deceived. Plaintiff desire to conduct further business with Defendant but cannot rely on Defendant's representations unless an injunction is issued.

100. As a result of its unfair, fraudulent, and unlawful conduct, Defendant has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff and Class members pursuant to Cal. Bus. & Prof. Code § 17203 and 17204.

101. Pursuant to Business & Professions Code §§ 17203 and 17500, Plaintiff and the members of the Class, on behalf of the general public, seek an order of this Court enjoining Defendant from continuing to engage, use, or employ their unfair, unlawful, and fraudulent practices.

102. Plaintiff has no adequate remedy at law in part because Defendant's conduct is continuing. Plaintiff therefore seeks an injunction on behalf of the general public to prevent Defendant from continuing to engage in the deceptive and misleading practices described herein.

**FOURTH CLAIM FOR RELIEF**
**False and Misleading Advertising**
**(Bus. & Prof. Code §§ 17500, et seq.)**
**(On Behalf of Plaintiff and the Class)**

103. Plaintiff hereby incorporates by reference the preceding paragraphs if fully restated here.

104. California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code section 17500, states that "[i]t is unlawful for any . . . corporation . . . with intent . . . to dispose of . . . personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

105. Defendant's material misrepresentations and omissions alleged herein violate Business and Professions Code section 17500.

106. Defendant knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

107. Pursuant to Business and Professions Code sections 17203 and 17500, Plaintiff and the members of the Class, on behalf of the general public, seek an order of this Court enjoining Defendant from continuing to engage, use, or employ their deceptive practices.

108. Further, Plaintiff requests an order awarding Plaintiff and Class members restitution of the money wrongfully acquired by Defendant by means of said misrepresentations.

109. Additionally, Plaintiff and the Class members seek an order requiring Defendant to pay attorneys' fees pursuant to California Civil Code section 1021.5.

**FIFTH CLAIM FOR RELIEF**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code § 1750, *et seq.*)**
**(On Behalf of Plaintiff and the Class)**

110. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

111. Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the lease of rental units:

   a. "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

   b. "Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5);

   c. "Advertising goods or services with intent not to sell them as advertised" (a)(9);

   d. "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited

by law" (a)(14);

  e. "Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product" (a)(20); and

  f. "Advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" (a)(29).

112. Specifically, Defendant advertises, displays, and offers to customers rentals at certain prices, but this is false because Defendant applies an "Utility Admin Fees" at the very end of the lease process when the Plaintiff and the Class members are left with no other viable options after having expended significant resources into moving.

113. At no time does Defendant disclose the true nature of its Utility Admin Fee; instead, it repeatedly conceals and misrepresents this material information at several steps of the transaction process.

114. Pursuant to § 1782(a) of the CLRA, Plaintiff' counsel notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act. If Defendant fails to respond to Plaintiff' letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice, as proscribed by §1782, Plaintiff will move to amend his Complaint to pursue claims for actual, punitive and statutory damages, as appropriate against Defendant. As to this cause of action, at this time, Plaintiff seeks only injunctive relief.

///

///

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the members of the Class seek an Order:

A. Certifying the proposed Class pursuant to Rule 23;

B. Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C. Declaring the Defendant has committed the violations of law alleged herein;

D. Providing for any and all injunctive relief the Court deems appropriate;

E. Awarding statutory damages in the maximum amount for which the law provides;

F. Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G. Providing for any and all equitable monetary relief the Court deems appropriate;

H. Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I. Awarding Plaintiff their reasonable costs and expenses of suit, including attorneys' fees;

J. Awarding pre- and post-judgment interest to the extent the law allows; and

K. Providing such further relief as this Court may deem just and proper.

Dated: September 10, 2024             Respectfully submitted,

**KALIELGOLD PLLC**

By: */s/ Jeffrey D. Kaliel*
Jeffrey D. Kaliel
Sophia G. Gold
Amanda J. Rosenberg

*Attorneys for Plaintiff and the Proposed Class*